T. L. MYERS, Appellee, v. J. B. TALLMAN, Appellant.

**FENCES:** Partition Fences—Undulating or Horizontal Measure-
1  ment. Where the fence viewers ordered a landowner to construct a certain number of rods of partition fence, *held*, the specified number of rods should be determined by measuring over the

undulating surface of the ground and not by a level horizontal measurement.

ESTOPPEL:   Inconsistent Attitudes—Alleging Contradictions—Partition Fences.  He is not to be heard who alleges things contradictory to each other.

    PRINCIPLE APPLIED:  Plaintiff made application to the fence viewers and secured an order commanding defendant to maintain "a hog-tight" partition fence across a stream.  Defendant adopted and constructed a device which was the only practical method of maintaining "a hog-tight" fence across the stream.  *Held,* plaintiff would not be permitted to say that defendant's structure interfered with the free course of the water.

FENCES:   Partition Fences—"Hog Tight"—Streams—Applicability of Statute.  Whether the law with reference to partition fences and the requirements to keep same "hog-tight" is applicable to fences across substantial streams, query.

FENCES:   Partition Fences Across Streams—"Hog-Tight" Requirement.  Where defendant was under legal orders to maintain the major portion of a required hog-tight partition fence across a stream and plaintiff was under like orders to maintain the remaining portion of such fence, plaintiff having originally secured the order that such fence be so maintained, *held,* that each was under obligation to so maintain his respective portion as to maintain equal pressure on the banks in high water.

ESTOPPEL:   Partition Fences—Failure to Maintain—Equal Fault.  No man can take advantage of his own wrong.

    PRINCIPLE APPLIED:  Plaintiff and defendant were both under legal orders to maintain a required hog-tight partition fence across the bed of a stream, defendant having the major portion of the fence.  Plaintiff so constructed his portion that the pressure of water was greater against the bank where his portion of the fence was located, thereby *threatening a washing out of the bank.*  To obviate this he built a so-called jetty to deflect the current.  *Held,* his own fault having contributed to the necessity for the jetty, he could not recover the cost of the same of defendant, even though defendant was in fault in having perversely refused to maintain 18 inches of his fence.

*Appeal from Guthrie District Court.*—HON. W. H. FAHEY, Judge.

THURSDAY, NOVEMBER 5, 1914.

REHEARING DENIED MONDAY, FEBRUARY 15, 1915.

SUIT in equity to enjoin the defendant from maintaining a certain fence across a creek, on the ground that it diverted the flow of water to the damage of the plaintiff. There was a decree for plaintiff substantially as prayed. The defendant appeals.—*Affirmed* in part, *Reversed* in part.

*Weeks, Vincent & Weeks,* for appellee.

*Sayles & Taylor,* for appellant.

EVANS, J.—The parties are adjoining landowners and are under mutual obligation to maintain the partition fence.

The partition line between them is approximately 57 rods long and runs north and south; the land of plaintiff Myers lies on the east side of the line and that of the defendant, Tallman, on the west. The partition line crosses a large creek, known as Brushy Fork, and this is the battle-ground.

The general course of the creek and its flow is from west to east. At the partition line it runs due east, cutting the line at right angles.

The fence involved in this suit is that part of the partition fence constructed by the defendant between the banks of this creek. As will be hereinafter set forth, the defendant was under obligation to construct a "hog-tight" fence across this creek. There is no objection to its "hog-tight" character.

The claim of the plaintiff is that it is so constructed that it impedes the flow of water, and gathers sediment and drift, and diverts the current of the water towards the north bank, and that such diversion has caused the cutting of such north bank at the line and upon plaintiff's land, so as to threaten a change in the course or bed of the stream.

In order properly to get the situation of the parties, ref-

erence must be first had to a previous litigation between them, and to the judgment or order entered in such case.

In October, 1911, the plaintiff called the fence viewers to apportion the partition line in question. They ordered the plaintiff to construct the north 37 rods of such partition fence, and the defendant to construct the remainder.

Under this apportionment, it fell to the defendant to construct the fence across the creek. It was for this reason that the greater number of rods was apportioned to the plaintiff.

Under this order, the plaintiff's apportionment would extend to a point approximately one rod north of the water's edge in the creek at low water. This terminal point was upon the high bank, 8 feet or more above the low water level.

The order of the fence viewers was that the fence to be constructed should be "hog-tight." No further specification was included.

The defendant appealed to the district court. The result of the appeal was that another rod was added to the apportionment of the plaintiff. Each party complied with the final order of the court according to his conception of it.

The defendant was confronted with the difficulty of constructing a practical, hog-tight fence across this creek. This was a living stream with considerable variation in its flow of water. At low stage, the water was only a few inches deep, and extending over a width of 20 feet or more. High water increased the depth to several feet, the banks on each side being about 8 feet high and about 50 feet apart.

It is without serious dispute that an ordinary fence of posts and hog-tight woven wire could not be maintained across the bed of such a creek. It would necessarily be carried away by every freshet, through the weight of the water and its drift.

The defendant adopted a plan calculated to give permanency to his fence. Across the bed of the stream he sunk into the soil a large log 29 feet long and a foot or more in diameter. This he anchored down by various devices.

Alongside of this log and along the line of partition he drove posts into the bed of the stream, from the south bank to the north end of the log, which was close to the north bank. They were cedar posts about 6 inches wide, and were set 4 or 5 inches apart, and were spiked to the log as far as it extended. These posts were set at an angle of 45 degrees, leaning down stream, so as to facilitate the passing over them of the contents of the stream. They were from 2 to 2½ feet high above the bed, and were lower at the center than at the sides. This difference was intended to hold the current of high water as near the center of the stream as possible.

The plaintiff contends that the practical effect of this fence, as constructed, was to divert the current of the stream around its north end, and against its north bank, and that such diversion threatened the cutting of a new channel for the stream.

On the other hand, the defendant contends that the impeding effect of the fence upon the current was only such as was incidental to its character as a hog-tight fence, and that the diversion of the water complained of was directly caused through plaintiff's own default. In complying with the order of the court that he construct an additional rod of the partition fence, the plaintiff constructed the same in the form of a swinging gate. This gate was hung at its north end upon a post and extended south therefrom to the water's edge. The south end thereof was so adjusted that when high water reached it, it would swing down stream, thus leaving an opening for the running water. It had the merit that it imposed no obstacle to the current; but it is doubtful whether it imposed any more obstacle to the passing of hogs, if they had been present. It did not close automatically, and was usually left open.

It was the opinion of several witnesses on both sides that this opening at the north end of the defendant's fence tended to draw the current in that direction. We think such conclusion is fairly justified, upon a consideration of all the evi-

dence. The water naturally turned toward the point of least resistance. This effect was increased also by the fact that there was a space of from 14 to 18 inches between the north end of defendant's fence and the south end of the plaintiff's gate. This space was covered by neither party, because each claimed that it belonged to the other. This unoccupied space, of course, enlarged the opening and intensified the tendency of the water to that direction. The current thus formed tended to cut away the north bank, and tended to shift the bed of the stream accordingly.

The plaintiff demanded of the defendant that he remove the obstruction in the stream. Following this, the plaintiff built, for protection of the north bank, what is called a jetty. This was constructed of posts and planks so placed as to receive the force of the current, and to deflect it back toward midstream.

The defendant demanded the removal of this jetty, and has interposed a counterclaim in this action asking that its maintenance be enjoined, and that he recover damages caused thereby to his structure in the bed of the stream. His claim is that this deflection of the current has undermined the north end of his log and threatens to carry it down stream.

The controversy between the parties as to the space of 14 or 18 inches that separate their two structures is quite petty. It could have cost but a few dollars to close the gap, and either one of them might wisely have covered it with his eyes closed to the question of his strict obligation to do so.

1. FENCES: partition fences: undulating or horizontal measurement.

This part of the controversy arose over a difference in method of measuring the additional rod of fence which was imposed on plaintiff by the district court on appeal.

Plaintiff's south terminus, as made by the fence viewers, was at the top of the eight-foot bank. After the trial in the district court, the plaintiff set a large post south of such terminus, and from there extended a sixteen-foot gate, making a total extension of 17 feet. Defendant urges, however, that

this distance was measured down a sloping bank and that there was a vertical difference of eight feet between the south end of the gate and its north end. He contends that the measurement of the extra rod should be made on a level, and should be the equivalent of the *base line* of the triangle, instead of its hypotenuse.

This contention is based upon the rule in surveying that "the area of a piece of land is the area of the level surface included within the vertical planes through the boundary lines." This is doubtless the correct rule for the accurate determination of areas. The horizontal measurements are determinative of area, and not the increased distances which might result from following the undulation or precipices of an uneven surface. Such rule, however, is not controlling here. We have to do with construing the order of the fence viewers and of the district court.

The fence viewers ordered the plaintiff to build the north 37 rods of the partition fence. This partition fence was to be laid upon the surface of the ground and upon its undulations. Its length would necessarily be measured by the undulating surface and not by the level horizontal distance.

As we understand the record, the plaintiff had complied with the order of the fence viewers before the trial was had in the district court. The effect of the court order was that he build an additional rod.

There is no dispute between the parties as to the location of plaintiff's southern terminus as the fence viewers fixed it. So far then as the length of plaintiff's fence was concerned, it must be held that he conformed to the order of the court, and that the method of measurement adopted by him was the method contemplated by such order.

So far, also, as the disputed space of from 14 to 18 inches is concerned, the defendant was, and is, under obligation to cover it in substantially the same manner as he has covered the rest of the line in the creek bed.

As to the plaintiff's jetty, we are not able to determine

clearly from the record whether it is located upon the partition line. We infer that it is. If so, it will answer the purpose of a "hog-tight" fence, and in that respect will comply with the order of the court in the previous case. It ought, however, to be provided with suitable openings for the passing of water, above low water stage. The defendant's structure as a whole necessarily impedes to some extent the flow of the water, and to that extent increases the pressure upon the banks, especially when the water is high; but if the current is equalized as to both banks, it furnishes the only practical protection possible, in view of the necessity of maintaining a "hog-tight" fence across the bed of the stream.

It is argued for the plaintiff that the defendant's structure naturally gathers the debris that comes with the stream, and that it amounts, in fact, practically to a dam upon the stream, and that the defendant has no right to thus interfere with the free course of the water. However correct this argument might be as an abstract proposition, the plaintiff closed his mouth against it when he obtained the adjudication which required the defendant to maintain a hog-tight fence across the stream.

2. ESTOPPEL: inconsistent attitudes: alleging contradictions: partition fences.

If we had to pass upon the original propriety of that order, we should have grave doubts as to whether the law relating to partition fences and the apportioning of the same has any reference to such an undertaking as is here presented.

3. FENCES: partition fences: "hog tight:" streams: applicability of statute.

That partition fences may be ordered and laid over small streams, we have no doubt; but the larger the stream the greater the difficulty, and there must be some point of increase in the size of the stream wherein the building and maintenance of a partition fence over the same should be deemed impracticable, and therefore beyond the contemplation of the statute on that subject. See *Foster v. Bussey*, 132 Iowa 640.

In view of the mutual attitude of the parties both in this

suit and in their previous litigation, as respects the practicability of maintaining a hog-tight fence across this creek and the application of the statute thereto, we assume such applicability for the purpose of this appeal.

The case presented, therefore, is one wherein the defendant was bound to maintain a "hog-tight" fence across such stream. The decree entered herein which required him to remove this structure and to restore the currents of the river did not purport to absolve him in any degree from his obligation to perform the previous order of the court.

The oral findings of the court presented to him the following problem:

"It is urged for Mr. Tallman that the court required him to put in a hog-tight fence. Any fence that would turn stock in the stream would probably be sufficient but he has no right to deflect the water from its natural channel and turn it onto Mr. Myers' land. . . . I do not know what is practical for you to put in there. And all I do know is that what you have in there impedes the flow of the water and deflects it. I do not designate what kind of a structure you will build, you will have to put in something that does not impede the flow, and that is what the plaintiff will be required to do, he will have to construct it so as to leave the water unimpeded as much as he can and you will have to do the same in that part you put in."

The evidence in the record presents no other method which could be adopted for the maintenance of a successful hog-tight fence across this creek.

The statutory definition of a lawful fence is contained in Code Sec. 2367, in its amended form as amended by Chap. 138, Thirty-third General Assembly. Such chapter presents certain specifications which may be substituted by an equivalent. It presents no specifications for a hog-tight fence unless they are contained in the following proviso:

"Provided, however, that all partition fences may be made tight by the party desiring it, and, when his portion is so completed, and securely fastened to good substantial posts, set firmly in the ground, not more than twenty (20) feet apart, the adjoining property owner shall construct his portion of the adjoining fence, in a like tight manner, same to be securely fastened to good substantial posts, set firmly in the ground not more than twenty (20) feet apart. All tight partition fences shall consist of not less than twenty-four (24) inches of substantial woven wire on the bottom, with three (3) strands of barb wire with not less than thirty-six (36) barbs of two points to the rod on top, the top wire to be not less than forty-eight (48) inches, nor more than fifty-four (54) inches high, or not less than eighteen (18) inch substantial woven wire on the bottom with four (4) strands of barb wire of not less than thirty-six (36) barbs of two (2) points to the rod, the top wire to be not less than forty-eight (48) inches nor more than fifty-four inches high, or good substantial woven wire not less than forty-eight (48) inches nor more than fifty-four (54) inches high. In case adjoining owners or occupants of land shall use the same for pasturing sheep or swine, each shall keep his share of the partition fence in such condition as shall restrain such sheep or swine."

It will be noted from the last clause that a "hog-tight" fence is one which shall be kept "in such condition as shall restrain such sheep or swine."

If defendant had followed the actual specifications contained in the above proviso and had set his posts deep enough and had procured woven wire that was strong enough to withstand the weight of the flood and its contents, its effect as to the accumulation of debris and driftwood would necessarily be the same as that occasioned by the present structure.

There is no claim that the present structure actually dams the water; the water does pass through it somewhat impeded.

It is undisputed that the water has never appeared higher

**4. FENCES: partition fences across streams: "hog tight" requirement.**

above the structure than below it, although that may be the case to some extent when the opening at the north end is closed. But so far as the mere damming of the water is concerned, the plaintiff has no room to complain. His land is not on the upstream side of the structure. He is not complaining of overflow on the one hand or lack of water on the other. He is interested only in the "hog-tight" character of the structure, and in the maintenance of the current of the stream along its present channel. Our conclusion upon this record is that there is no other practical method of maintaining a "hog-tight" fence across this stream than the method adopted, provided uniformity of impediment be maintained at each bank.

We know of no place to look for affirmative guaranty of the ultimate success of the enterprise. It may go down stream in the end.

For the present, at least, the structure is a good-faith response to the order of the fence viewers, as confirmed on appeal. If such order has really called for what is impossible, within the approximate limits of the reasonable expense of a partition fence, future developments will bring the disclosure.

Certain it is that a litigant party should not be under the contradicting compulsion of one decree to construct and of another to tear down, unless, in performing the latter, he be absolved from the former.

Upon the record before us, therefore, we reach the following conclusions:

(1) That the defendant should be required to extend his structure to cover the disputed space of 14 or 18 inches.

(2) That with such extension he may maintain his present structure.

(3) That the plaintiff may maintain his present structure called a jetty or its equivalent, provided that suitable openings be made therein for the passage of water above low water stage, and that such openings shall be so made as to be calcu-

lated to maintain the equality of the pressure of high water upon each bank.

(4) That the defendant is not entitled to enjoin the use of such jetty in such manner and is not entitled to damages from the plaintiff for the previous use thereof.

(5) That the default of both parties contributed to the deflection of the current around the north end of the defendant's structure.

(6) That the plaintiff is not entitled to recover damages from the defendant for the expense of building the jetty, and the judgment entered in his favor therefor, for $90.20, is reversed.

5. ESTOPPEL: partition fences: failure to maintain: equal fault.

(7) That the plaintiff is not entitled to the order entered below requiring the defendant to remove the structure complained of, and the decree to that effect is reversed.

The costs in this court will be apportioned, one-half to each party.—*Affirmed* in part, *Reversed* in part.

LADD, C. J., WEAVER, GAYNOR and PRESTON, JJ., concur.